The presiding judge was of opinion that the plaintiffs, as trustees, could take and hold only property conveyed and intended for the use of the society, and that a conveyance to the trustees expressed on its fact to be for the use of the society, but in fact for the benefit of some other person, was not valid; that the use required must be one actually beneficial to the society, who could not constitute its trustees or itself trustee for third persons, and at all events, not for the uses and purposes specified by the witness. The judge was also of (191) opinion that evidence of such beneficial use for the society formed a necessary part of the plaintiffs' case, and though such use was prima facie to be inferred from the declaration in the deed, yet if the jury believed from the testimony of the witness that no beneficial use to the society was intended, but that the conveyance was made for the other purposes stated by the witness, the plaintiffs had not a title to the slave, and were not entitled to a verdict.
The counsel for the plaintiffs submitting to this opinion of the court, the plaintiffs were called, and, a motion to set aside the nonsuit having been refused, appealed to this Court.
The deed of gift executed to the three (200) trustees of the Friends Association does upon its face convey the negroes to them for the purposes authorized by the act of 1796, and, deciding from the conveyance alone, passes a valid title to them. But as the defendant was a stranger to the deed, it is competent for him to give parol evidence of the real objects of the deed, and of the trusts it was intended to effect beyond those expressed. 3 Term, 474; 8 Term, 379; Starkie on Ev., 4, 1051; 10 Johns., 229.
Before the passing of the act of 1796 the Society of Friends had no capacity to acquire property as an association, because *Page 120 
they were not incorporated; they could take only in their individual characters, the gift being confined to the very persons in existence when it was made. To enable it to manage its own affairs and to own property for the exclusive use of the society as a religious association without the continual necessity of conveying it from one to another, the act of 1796 was passed. A corporation exists but in contemplation of law, and possesses those properties only which the law confers upon it. By the very act of incorporation, and without any special power to that purpose, it is incidental to it to acquire property. But as it is the creature of the legislative will, it is competent for the Legislature to limit its capacities and powers as it may think proper. It may withhold altogether its capacity to acquire property; it may consequently limit and restrain it to definite purposes. It cannot be said of the trustees of this society that they have a general power to purchase and hold this property, because the act declares that they shall hold it in trust for the use and benefit of the society. If, then, the case discloses the fact that the trustees hold this property for an use different from that of the society, and for the benefit of persons not contemplated by the Legislature when they gave the power, (201) and for objects that are not less adverse to the words and spirit of the act than to the general policy of the law, I think it will follow that the plaintiffs have no title to recover.
What are the real objects of the donation? The individuals composing this society believe it to be repugnant to their religious principles to become the owners of slaves, and will not employ their labor to the profit and advantage of themselves or of the society. The trustees were to act as guardians to the slaves, and to hold them for the benefit of the slaves themselves, who were to receive the surplus of the profits of their labor for their own emolument, and ultimately to emancipate them whenever it could be done consistently with the laws of the State.
So far, then, from the plaintiffs taking the property for the objects permitted by the act of 1796, it appears to me that nothing but the name is wanting to render it at once a complete emancipation; the trustees are but nominally the owners, and it is merely colorable to talk of a future emancipation by law, for as none can be set free but for meritorious services, the idea that a collection of them will perform such services, under the construction which those terms in the act of 1777 have uniformly received, is quite chimerical.
It is said that the Legislature could not mean that the society should take no property but such as it derived a pecuniary *Page 121 
benefit from. Certainly that was not their intention; but it evidently was their intention that the property they were allowed to acquire should subserve in some way the legitimate object of a religious association, which every man can comprehend when stated, though it may be difficult to give a definition that shall include the whole.
A place of worship, of interment, the support of a minister, the means of educating and assisting their poor members, and various other objects which yield no pecuniary profit, we perceive at once to be within the scope of the (202) permission.
But if a sense of religious obligation dictates to any society the exercise of an enlarged benevolence which, however virtuous and just in the abstract, the policy of the law, founded on the duty of self-preservation, has forbidden, it irresistibly follows that a transfer of property so directed must be void.
Nor do I feel the force of the remark that the property belongs to the society that they may make profit out of it if they choose, or sell it or dispose of it in any way that another owner might. This is to presume that a society not less remarkable for the purity of its principles than for an unshaken steadfastness in maintaining them will at once degenerate from their long-tried morality. The whole history of the people called Quakers shows that neither prosperity nor adversity, favor or persecution, or any known vicissitude of their condition, has ever interrupted the even tenor of their ways. I firmly believe — indeed, I consider it morally certain — that if the plaintiffs recover, this property will be disposed of in the manner described by the witness, and in no other.
It is true that an individual may purchase a slave from gratitude or affection, and afford him such indulgences as to preclude all notion of profit. The right of acquiring property and of disposing of it in any way consistently with law is one of the primary rights which every member of society enjoys. But when the law invests individuals or societies with a political character and personality entirely distinct from their natural capacity, it may also restrain them in the acquisition or uses of property. Our law allows the trustees to hold them for the benefit of the society, whereas in truth they hold them for the benefit of the slaves themselves, and only in the name of the society.
I cannot distinguish this case in principle from the (203) former decisions wherein trusts for the emancipation of slaves have been held void in equity, on the ground that the *Page 122 
law had forbidden such attempts, except in the manner prescribed by the act of 1777. There resort was necessarily had to equity, because the legal title passed to the executors; but here, as it is justly remarked by the judge who tried the cause, evidence of the beneficial use for the society forms a necessary part of the plaintiffs' title, of which, though the deed is primafacie evidence, it is not conclusive.
Upon the whole, my opinion is that the plaintiffs have no legal title, and although the province of this Court is to administer the law as they find it, without any regard to consequences, yet my judgment is in some degree fortified by the belief that a contrary decision would produce most, if not all, of the ill effects which the Legislature sought to avoid by the act of 1777.
If that law could be eluded by transferring slaves to this society, there is no foreseeing to what extent the mischief might be carried. Numerous collections of slaves, having nothing but the name, and working for their own benefit, in the view and under the continual observation of others who are compelled to labor for their owners, would naturally excite in the latter discontent with their condition, encourage idleness and disobedience, and lead possibly in the course of human events to the most calamitous of all contests, a bellum servile.